708 A.2d 1066

**COUNTY COMMISSIONERS OF QUEEN ANNE'S COUNTY, et al.**

v.

**SOARING VISTAS PROPERTIES, INC., et al.**

No. 741, Sept. Term, 1997.

Court of Special Appeals of Maryland.

April 29, 1998.

Lynn McLain, Baltimore (Patrick Thompson, Foster, Braden & Thompson, Stevensville and George A. Weber, III and Law Offices of Peter Angelos, Baltimore, on the brief), for appellants.

Ernest S. Cookerly, Cookerly & Barroll, LLC, Chestertown and Edward H. Hammond, Ocean City, for Amicus Curiae, County Com'rs of Kent County.

Warren K. Rich and William D. Evans (Rich and Henderson, P.C., on the brief), Annapolis, for appellees.

Argued before MOYLAN, HOLLANDER and SONNER, JJ.

HOLLANDER, Judge.

In this case, we must determine whether State law preempts a local zoning ordinance that makes construction of a sewage sludge storage facility a conditional use. Soaring Vistas Properties, Inc. ("Soaring Vistas") and Wheelabrator Water Technologies, Inc. ("Wheelabrator"), appellees, filed suit in the Circuit Court for Queen Anne's County against the following parties, all appellants herein: Queen Anne's County (the "County"); the County Commissioners of Queen Anne's County (the "Commissioners"); Michael F. Zimmer, Jr., President of the Commissioners; George P. O'Donnell, Vice–President of the Commissioners; and Mark Belton, Commissioner of Queen Anne's County. Appellees sought declaratory and injunctive relief, alleging that Maryland Code (1982, 1996 Repl.Vol.), §§ 9–230 through 9–249 of the Environment Article ("E.A.") ("Sewage Sludge Part"), preempted §§ 4002 and 7203(C) of the Queen Anne's County Zoning Ordinance (the "Zoning Ordinance").

Both parties moved for summary judgment. In their motion, appellants argued that State law did not preempt the County's right to regulate sewage sludge storage facilities. After the trial court granted appellees' motion for summary judgment, appellants timely noted their appeal. They present two questions for our review, which we have restated slightly:

I.  Did the trial court err in granting appellees' motion for summary judgment, when it held that the Environment Article of the Maryland Code preempts that part of the Zoning Ordinance that makes permanent sludge storage facilities a conditional use, subject to evaluation by the County under traditional zoning criteria?

II. Did the trial court err in granting appellees' motion for summary judgment, when it held unconstitutional the Zoning Ordinance that makes permanent sludge storage facilities a conditional use subject to evaluation by the County under traditional zoning criteria?

Although not framed as a specific question, at the conclusion of their brief, appellants also asked us to remand the case to the circuit court for entry of summary judgment in their favor with respect to the preemption issue, in order to uphold "the validity of that part of the Queen Anne's County ordinance that makes sewage sludge facilities a conditional use."

For the reasons set forth below, we conclude that the trial court erred in granting summary judgment in favor of appellees, and in failing to grant summary judgment in favor of appellants. Accordingly, we shall vacate the entry of summary judgment and remand this case to the circuit court for further proceedings.

## FACTUAL SUMMARY

Soaring Vista, a wholly-owned subsidiary of Wheelabrator, owns 425.67 acres of farmland in the County, zoned for agricultural use. The land is used for farming and guided game hunting. Wheelabrator, which operates the farm through its Bio Gro Division, conducts farming operations on the land, including the production of corn, soybean, wheat, alfalfa and orchard grass hay. As part of its operation, Wheelabrator applies biosolids, also known as treated sewage sludge, to the farmland as fertilizer and soil conditioner. In order to store more sewage sludge, Wheelabrator sought to construct a 3.4 acre sewage sludge storage facility (the "Facility") on the property. The proposed facility would include two silos, each 14 feet high and 135 feet in diameter, with the capacity to hold 2,697,400 gallons, or 11,464 wet tons of sewage sludge.

On December 29, 1994, Wheelabrator applied to the Maryland Department of the Environment ("MDE") for a State Sewage Sludge Utilization Permit for the Facility, in accordance with E.A. § 9–231. Thereafter, the Commissioners advised appellees that, pursuant to §§ 4002 and 7203(C) of the Zoning Ordinance, they had to obtain a conditional use permit before the Facility could be built and operated.

On September 15, 1995, Wheelabrator filed a conditional use application with the County. Subsequently, on May 21, 1996, MDE issued a draft permit and tentative decision approving the Facility. Section (G)(3) of the draft permit provided, in part, that "[t]he issuance of this permit does not . . . authorize . . . any infringement of federal, state, or local laws or regulations." Attached to the draft permit was a letter to Wheelabrator from Gail Castleman, the Hearings Coordinator for the Waste Management Administration, a division of MDE. Ms. Castleman wrote that the draft permit "represents **a tentative determination** by the Waste Management Administration on [the] application; it is not the official finalized permit to construct and operate the wastewater sludge storage facility at the Soaring Vista Properties site near Church Hill, Maryland." (Boldface in original).

Shortly thereafter, on July 2, 1996, the Commissioners enacted Ordinance No. 96–07 (the "Moratorium"), which established a six month moratorium on all new applications for sewage sludge storage facilities or rubble landfills, and on all pending applications for those facilities. The purpose of the Moratorium was to allow County officials an opportunity to examine existing sewage sludge and rubble landfill regulations, and to modify them if necessary to protect and promote the public health, safety, and general welfare. The Moratorium prompted appellees to file suit on August 16, 1996, seeking declaratory and injunctive relief with respect to the enforcement of the Moratorium and §§ 4002 and 7203(C) of the Zoning Ordinance. The parties agree that the dispute concerning the Moratorium is now moot.

On January 7, 1997, prior to the trial court's decision concerning the cross-motions for summary judgment, A. Hussain Alhija, Acting Chief of the Design and Certification Division of MDE, issued a letter to "Concerned Citizen[s]" regarding the Facility, stating that "it is recommended that this permit be issued, but that the draft permit be amended to address certain concerns expressed by members of the community which will host this sewage sludge storage facility." Alhija attached to the letter a document titled "NOTICE OF

FINAL DETERMINATION AND OPPORTUNITY TO RE-QUEST A CONTESTED CASE HEARING," which provided that MDE "has made a final determination to issue the Sewage Sludge Utilization Permit for this site." A document styled "Findings and Recommendations" was also appended to the letter. It stated, in part:

7. ISSUE: MDE should adhere to the County's six month moratorium on sewage sludge storage facilities and rubblefills, which started on July 2, 1996.

RESPONSE: MDE considers an application for a Sewage Sludge Utilization Permit based on environmental and public health determinations. *Zoning and other local issues must be determined separately by the local authority, but the Sewage Sludge Utilization Permit does not allow the permittee to violate local laws or regulations,* as stated in the draft permit's General Conditions Part G:

"2. Nothing in this permit shall be construed to preclude the institution of any legal action nor relieve the permittee from civil or criminal responsibilities and/or penalties *for noncompliance with Title 7 and 9 of the Environment Article, Annotated Code of Maryland or any federal, local or other state law or regulation.*

3. The issuance of this permit does not convey any property rights in either real or personal property, or any exclusive privileges nor does it authorize any injury to private property or any invasion of personal rights, *nor any infringement of federal, state, or local laws or regulations.*"

\* \* \*

10. ISSUE: Increased truck traffic will cause dangerous conditions.

RESPONSE: *Zoning issues are out of the jurisdiction of the Department,* but as indicated in response # 7 *the permit does not allow violation of local laws and regulations.*

\* \* \*

22. ISSUE: Approvals are needed from the State Fire Marshall, the Department of Agriculture, and the Department of Transportation.

RESPONSE: Approvals from these agencies are not required by law or regulation for issuance of a sewage sludge storage permit. However, as shown in response *# 7 the permit does not allow violation of local laws and regulations.*

(Boldface in original; italics added).

Thereafter, the trial court granted appellees' motion for summary judgment. The court also declared that §§ 4002 and 7203(C), "insofar as they apply to biosolids (sewage sludge) utilization, are unconstitutional, unlawful, null and void because they conflict with the State's statutory and regulatory scheme for issuing sewage sludge utilization permits and are impliedly preempted thereby." In a written memorandum and order dated March 10, 1997, the court explained, in pertinent part:

The local ordinances restricting sewage sludge utilization, *i.e.*[,] the Moratorium and Zoning Ordinance §§ 4002 and 7203(c) [sic], are preempted by §§ 9–230 through 9–249 of the Environment Article.

\* \* \*

In [*Talbot County v.*] *Skipper* [329 Md. 481, 620 A.2d 880 (1993) ], the Court of Appeals specifically stated that the General Assembly has preempted the field of sewage sludge utilization. The Court held that Environment Article, §§ 9–230 through 9–249, constitutes a very comprehensive scheme regulating sewage sludge utilization in Maryland (*Skipper*, 329 Md., at 491–92, 620 A.2d 880)[.]

\* \* \*

Here, then, it is clear that the General Assembly has preempted the field of sewage sludge utilization. There-

fore, the Moratorium and §§ 4002 and 7203(c) [sic] of the Zoning Ordinance are invalid.

\* \* \*

Environment Article § 9–201(t) states, " 'Utilize Sewage Sludge' " means to collect, handle, burn, store, treat, or transport sewage sludge to or from a sewage sludge generator or utilizer in this State, to apply it to land, or to dispose of it." A sewage sludge utilization permit authorizes the permit holder, *inter alia,* to land apply sewage sludge according to the terms of the permit. Environment Article, § 9–237(a).

\* \* \*

Sections 4002 and 7203(c) [sic], requiring conditional use approval of sewage sludge facilities, are [in direct conflict with E.A. § 9–237(a) ] as they place additional restrictions on the usage of sewage sludge. The Environment Article specifically authorizes the storage of sewage sludge once an MDE permit has been issued. Here, the applicable sections of the Zoning Ordinance, by means of the conditional use requirement, prohibit an activity which the Legislature expressly intended to permit.

The court denied appellees' other contentions as moot.

## STANDARD OF REVIEW

Maryland Rule 2–501, which governs summary judgment, provides that a trial court may grant a motion for summary judgment only if there is no genuine dispute as to any material fact and one party is entitled to judgment as matter of law. *Bagwell v. Peninsula Regional Medical Ctr.,* 106 Md.App. 470, 488, 665 A.2d 297 (1995), *cert. denied,* 341 Md. 172, 669 A.2d 1360 (1996); *see also Southland Corp. v. Griffith,* 332 Md. 704, 712, 633 A.2d 84 (1993); *Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 737–38, 625 A.2d 1005 (1993); *Sachs v. Regal Savings Bank, FSB,* 119 Md.App. 276, 277, 705 A.2d 1 (1998); *Bits "N" Bytes Computer Supplies, Inc. v. Chesapeake*

& Potomac Tel. Co., 97 Md.App. 557, 580–81, 631 A.2d 485 (1993), cert. denied, 333 Md. 385, 635 A.2d 425 (1994); Seaboard Sur. Co. v. Richard F. Kline, Inc., 91 Md.App. 236, 242–45, 603 A.2d 1357 (1992). Conversely, the entry of summary judgment is not foreclosed if a dispute exists as to a fact that is not material to the outcome of the case. Scroggins v. Dahne, 335 Md. 688, 691, 645 A.2d 1160 (1994). A material fact is one that will somehow affect the outcome of the case. King v. Bankerd, 303 Md. 98, 111, 492 A.2d 608 (1985).

In resolving the motion, the court must construe the facts, and all inferences reasonably drawn from those facts, in the light most favorable to the non-moving party. Dobbins v. Washington Suburban Sanitary Comm'n, 338 Md. 341, 345, 658 A.2d 675 (1995); King, 303 Md. at 110–11, 492 A.2d 608; Tennant v. Shoppers Food Warehouse Md. Corp., 115 Md. App. 381, 387, 693 A.2d 370 (1997); Bagwell, 106 Md.App. at 488, 665 A.2d 297. Mere formal denials or conclusory allegations of a party are not sufficient to prevent summary judgment. Tennant, 115 Md.App. at 386–87, 693 A.2d 370; Bagwell, 106 Md.App. at 488, 665 A.2d 297; Seaboard Sur., 91 Md.App. at 243, 603 A.2d 1357.

In the absence of a genuine dispute as to material fact, this Court must determine whether the trial court was legally correct. Beatty, 330 Md. at 737, 625 A.2d 1005; see also Heat & Power Corp. v. Air Prods. & Chems., Inc., 320 Md. 584, 591, 578 A.2d 1202 (1990); King, 303 Md. at 111, 492 A.2d 608. Ordinarily, we will review a trial court's decision granting summary judgment "only on the grounds relied upon by the trial court." Blades v. Woods, 338 Md. 475, 478, 659 A.2d 872 (1995); see Hoffman v. United Iron and Metal Co., Inc., 108 Md.App. 117, 132–33, 671 A.2d 55 (1996).

## THE STATUTORY SCHEMES

Section 4002 of the Zoning Ordinance categorizes uses that are permitted by right, uses that are conditional, as well as uses that are prohibited in certain districts. "Extraction and Disposal" operations on agricultural land are permitted only

as conditional uses. Section 4002(E)(3). Pursuant to section 4009(C), entitled "INDUSTRIAL USES," operations involving "Extraction and disposal" include "sludge disposal or storage." [1] Section 4009(C) further provides that such "uses create major disruptions to the area's environment, even when carefully regulated. Dust, dirt, noise, and unsightly conditions can be anticipated. None of these uses is an acceptable neighbor in a residential environment."

Section 7202 of the Zoning Ordinance sets forth standards for conditional uses, including the findings that the County Board of Appeals must make in order to grant an application for a conditional use in a proposed location. Section 7202 provides, in part:

No application for a conditional use shall be approved unless the Board of Appeals shall specifically find the proposed conditional use appropriate in the location for which it is proposed. This finding shall be based on the following criteria:

   A.   The proposed use at the proposed location shall be in harmony with the general purpose, goals, objectives, and standards of Queen Anne's County Comprehensive Plan, this Ordinance, or any other plan, program, map, or ordinance adopted, or under consideration pursuant to official notice, by the County.

   B.   The proposed use at the proposed location shall not result in a substantial or undue adverse effect on adjacent property, the character of the neighborhood, traffic conditions, parking, public improvements, public sites or rights-of-way, or other matters affecting the public health, safety, and general welfare.

Section 7203 of the Zoning Ordinance establishes standards that must be met for certain specified conditional uses, in

---

1. Although the Zoning Ordinance classified sewage sludge storage as an industrial use, rather than an agricultural use, appellees never contested the classification. Moreover, in their brief, appellees maintain that the Sewage Sludge Part makes no distinction concerning whether the use is industrial or agricultural.

addition to the requirements that are set forth in Section 7202. Specifically, § 7203(C), which is entitled "Extraction and Disposal," pertains to sludge disposal operations, including "landfills, trash transfer sites, incinerators, sludge or other land disposal or storage of septic tank wastes or sludges." It mandates that an applicant must provide certain additional information, including, *inter alia,* a plan of the general area, a plan of the proposed site, a plan of the operation, an end use plan, and performance standards for the operation of the facility.

As we shall see, the State has enacted a broad statutory scheme governing sewage sludge. E.A. § 9–230 directs MDE to adopt regulations governing sewage sludge utilization, and it requires Department of Agriculture approval of regulations that pertain to land application of sewage sludge. It further delineates matters that must be considered in adopting regulations, including alternative utilization methods, pathogen control, advertising requirements concerning both public hearings and public information meetings, performance bonds, liability insurance or other forms of security, procedures for notifying local governments and other interested parties, and adequate standards for transporting sewage sludge. E.A. § 9–230(b).

In adopting regulations for the land application of sewage sludge, E.A. § 9–230(c) requires MDE to consider, *inter alia,* methods for calculating loading rates, crops that are to be grown on the land on which the sewage sludge will be applied, the nature of nearby surface water or groundwater, the character of any affected area, and the character of any nearby existing or planned land uses and transport routes. Further, E.A. § 9–230(c) requires consideration of the proximity of the land on which the sewage sludge may be applied to "sensitive" areas, such as flood plains, wetlands, and other areas of critical concern. It also requires consideration of reasonable buffer areas to separate homes or other property from land on which sewage sludge may be applied.

Prior to utilizing sewage sludge, E.A. § 9–231 requires a person to obtain a permit from MDE, and E.A. § 9–232

establishes the requirements for sewage sludge utilization permits. These include, *inter alia,* a certification from the applicant as to the truth and accuracy of the completed application, the written consent of the owner of the land on which the sewage will be applied, an agreement to permit access to the site for inspections, and the filing of a bond or other security. E.A. § 9–232. E.A. § 9–234 pertains to public hearings in connection with an application for a permit to use sewage sludge.

Under E.A. § 9–236, MDE is required to issue a sewage sludge utilization permit to an applicant who satisfies the requirements of the subtitle. Further, E.A. § 9–237 provides that the holder of the permit is authorized to utilize sewage sludge in accordance with the terms of the permit. In E.A. §§ 9–238 and 9–239, the Legislature established procedures for the term and renewal of sewage sludge utilization permits. In addition, in E.A. §§ 9–240 through 9–243, the Legislature set forth the requirements to maintain a sewage sludge utilization permit. E.A. § 9–245 governs denial of a sewage sludge utilization permit, while E.A. § 9–246 delineates when MDE may suspend, revoke, modify, or refuse to renew a permit.

A "Sewage Sludge Utilization Fund" has been created pursuant to E.A. § 9–244. E.A. § 9–247 pertains to standing to sue or intervene in a suit to force compliance with the Sewage Sludge Part and E.A. §§ 9–269 and 9–270. Further, E.A. § 9–248 authorizes MDE to seek an injunction for any violation concerning the utilization of sewage sludge. In E.A. § 9–249, the Legislature mandates that sewage sludge must be utilized in accordance with the Sewage Sludge subtitle, as well as E.A. §§ 9–269 and 9–270. Other sections will be discussed, *infra.*

## DISCUSSION

### A.

The crux of appellants' contention is that the Sewage Sludge Part, E.A. §§ 9–230 through 9–249, does not preempt §§ 4002 and 7203(C) of the Zoning Ordinance, which makes the erec-

tion of a sewage sludge storage facility a conditional use. In particular, appellants focus on the right of local government to determine the location of such facilities. Moreover, they suggest that the decision of the trial court, which divested the County of its traditional zoning power, has broad implications for all local governments.

Appellees counter that the General Assembly's enactment of a comprehensive, ubiquitous statutory scheme concerning sewage sludge manifests its intent to preempt regulation of the field. Thus, appellees contend that even if the Zoning Ordinance does not expressly conflict with State law, it is nevertheless preempted by implication. Consequently, they assert that the Zoning Ordinance is of no effect.

Our task, then, requires us to resolve whether the Sewage Sludge Part preempts §§ 4002 and 7203(C) of the Zoning Ordinance. We conclude that it does not.

■ A State law will ordinarily preempt a local law "in one of three ways: (1) preemption by conflict; (2) express preemption; or (3) implied preemption." *Perdue Farms Inc. v. Hadder*, 109 Md.App. 582, 588, 675 A.2d 577 (1996); *see Talbot County v. Skipper*, 329 Md. 481, 487–88, 620 A.2d 880 (1993); *May Dep't Stores v. Montgomery County*, 118 Md.App. 441, 462, 702 A.2d 988 (1997); *cert. granted*, 349 Md. 237, 707 A.2d 1330 (1998). In *Ad + Soil, Inc. v. County Commissioners of Queen Anne's County*, 307 Md. 307, 513 A.2d 893 (1986), the Court explained:

> The doctrine of pre-emption is grounded upon the authority of the General Assembly to reserve for itself exclusive dominion over an entire field of legislative concern. When properly invoked, the doctrine precludes local legislative bodies from enacting any legislation whatsoever in the preempted field.

*Id.* at 324, 513 A.2d 893.

The Sewage Sludge Part does not expressly preempt local zoning law in connection with the storage of sewage sludge. The trial court found, instead, that the Legislature impliedly preempted the field. Accordingly, we first consider the validity of the court's finding of preemption by implication.

B.

There is no precise formula for determining whether the Legislature impliedly intended to preempt an entire field of law. *Skipper,* 329 Md. at 488, 620 A.2d 880; *see Howard County v. Potomac Elec. Power Co.,* 319 Md. 511, 523, 573 A.2d 821 (1990). Absent express preemption, a primary indicator of "a legislative purpose to pre-empt an entire field of law is the comprehensiveness with which the General Assembly has legislated the field." *Allied Vending, Inc. v. Bowie,* 332 Md. 279, 299, 631 A.2d 77 (1993) (citations and quotations omitted); *see Ad + Soil,* 307 Md. at 328, 513 A.2d 893; *Mayor of Baltimore v. Sitnick & Firey,* 254 Md. 303, 323, 255 A.2d 376 (1969).

A variety of secondary factors are often considered in deciding whether State law preempts a local law by implication. In *Allied Vending,* 332 Md. 279, 631 A.2d 77, the Court stated that courts should consider

1) whether local laws existed prior to the enactment of the state laws governing the same subject matter, 2) whether the state laws provide for pervasive administrative regulation, 3) whether the local ordinance regulates an area in which some local control has traditionally been allowed, 4) whether the state law expressly provides concurrent legislative authority to local jurisdictions or requires compliance with local ordinances, 5) whether a state agency responsible for administering and enforcing the state law has recognized local authority to act in the field, 6) whether the particular aspect of the field sought to be regulated by the local government has been addressed by the state legislature, and 7) whether a two-tiered regulatory process existing if local laws were not pre-empted would engender chaos and confusion[.]

*Id.* at 299–300, 631 A.2d 77 (citations omitted); *see Mayor of Baltimore v. New Pulaski Co. Ltd. Partnership,* 112 Md.App. 218, 226–27, 684 A.2d 888 (1996), *cert. denied,* 344 Md. 717, 690 A.2d 523 (1997).

■ In analyzing the doctrine of preemption in the context of this case, we must also understand what is meant by the term "conditional use" within the meaning of zoning law. Recently, in *Richmarr Holly Hills, Inc. v. American PCS, L.P.,* 117 Md.App. 607, 701 A.2d 879 (1997), we observed:

> "The conditional use or special exception [2] is a part of the comprehensive zoning plan sharing the presumption that, as such, it is in the interest of the general welfare, and therefore, valid. The special exception is a valid zoning mechanism that delegates to an administrative board a limited authority to allow enumerated uses which the legislature has determined to be permissible absent any fact or circumstance negating the presumption. The duties given the Board are to judge whether the neighboring properties in the general neighborhood would be adversely affected and whether the use in the particular case is in harmony with the general purpose and intent of the plan."

*Id.* at 644–45, 701 A.2d 879 (quoting *Anderson v. Sawyer,* 23 Md.App. 612, 617, 329 A.2d 716 (1974)). We also examined the concept of conditional use in *Cromwell v. Ward,* 102 Md.App. 691, 651 A.2d 424 (1995), stating: " 'A conditional use is a desirable use which is attended with detrimental effects which require that certain conditions be met....' " *Id.* at 702, 651 A.2d 424 (citations omitted). Accordingly, conditional uses are permitted uses, so long as the conditions set out in the zoning ordinance are satisfied. *Id.* at 699 n. 5, 651 A.2d 424.

In reaching its conclusion of implied preemption, the trial court relied on *Talbot County v. Skipper,* 329 Md. 481, 620 A.2d 880. Appellants posit that *Ad + Soil,* 307 Md. 307, 513 A.2d 893, not *Skipper,* controls.

In *Ad + Soil,* the Court considered whether State law governing the management and utilization of sewage sludge precluded Queen Anne's County from exercising its local

---

**2.** The terms "conditional use" and "special exception use" are frequently interchanged. *Richmarr,* 117 Md.App. at 643 n. 26, 701 A.2d 879; *see Hofmeister v. Frank Realty Co.,* 35 Md.App. 691, 699, 373 A.2d 273 (1977).

zoning authority to regulate the operation of a sewage sludge facility. Concluding that State law then in effect did not preempt the field of sewage sludge utilization, the Court determined that enactment or enforcement of local zoning laws was not prohibited. *Ad + Soil,* 307 Md. at 324, 513 A.2d 893. Notwithstanding the enactment of "extensive statewide legislation in the field of sewage management, the legislation manifests a general policy of fostering local control under state supervision, rather than to totally prohibit the enactment of laws on the subject at the local level." *Id.* at 326, 513 A.2d 893. The Court further said:

> The General Assembly simply did not legislate upon the interplay between the state statutes and the pre-existing local zoning regulations, thereby suggesting that it intended no change in the applicability of such local regulations. Thus, *the state permits must be viewed as authorization to operate a sewage sludge facility, subject to the lawful requirements of the applicable zoning regulations.* Because Ad + Soil's compliance with the Zoning Ordinance is in effect an implicit condition in the state permits, the Ordinance cannot be said to prohibit what the permits authorize.

*Id.* at 336, 513 A.2d 893 (emphasis added).

The *Ad + Soil* Court observed that State policy has long recognized the role of local government in implementing planning and zoning controls. *Ad + Soil,* 307 Md. at 334, 513 A.2d 893. Notwithstanding the Legislature's enactment of "a statewide regulatory panoply," the Court acknowledged that "state law clearly contemplates a pervasive and vital role for local legislation in the field of sewage management." *Id.* at 328, 513 A.2d 893. Accordingly, it determined that "*evidence of a countervailing legislative purpose to prohibit local zoning control in the field of sludge utilization must be strong indeed."* *Id.* at 334, 513 A.2d 893 (emphasis added). The Court explained:

> [L]ocal regulation of potentially obnoxious uses of land far antedates the state statutes in question, and as previously observed, the General Assembly is presumed to be aware of existing local law when it legislates. That the state legisla-

ture did not address the interaction of its statutes with pre-existing local zoning laws suggests that it intended no change in the applicability of the local laws.

307 Md. at 333, 513 A.2d 893.

Seven years after *Ad + Soil,* the Court decided *Talbot County v. Skipper,* 329 Md. 481, 620 A.2d 880. There, three Talbot County farmers and Bio–Gro Systems, Inc., a company that applies sewage sludge to farmland, filed a complaint against the County, seeking declaratory and injunctive relief on the ground that State law preempted Talbot County Ordinance § 19–8(j)(i). The ordinance required land owners to record certain information concerning their sewage sludge permit in the county land records within thirty days of their initial land application of sewage sludge pursuant to a State permit. The *Skipper* Court held that Maryland Code (1982, 1987 Repl.Vol., 1992 Supp.), §§ 9–230 through 9–249 of the Environment Article, impliedly preempted the county ordinance.

The Court explained that State law ordinarily preempts local law by implication when the local law " 'deal[s] with an area in which the [State] Legislature has acted with such force that an intent by the State to occupy the entire field must be implied[.]' " *Skipper,* 329 Md. at 488, 620 A.2d 880 (quoting *County Council v. Montgomery Ass'n, Inc.,* 274 Md. 52, 59, 333 A.2d 596 (1975)). The Court further recognized that a " ' "primary indicia of a legislative purpose to preempt an entire field of law is the comprehensiveness with which the General Assembly has legislated in the field." ' " *Id.* (Quoting *Potomac Elec.,* 319 Md. at 523, 573 A.2d 821 (quoting *Board of Child Care v. Harker,* 316 Md. 683, 696–97, 561 A.2d 219 (1989))). In this regard, the Court observed that E.A. §§ 9–230 through 9–249 constituted a comprehensive scheme "regulating all aspects of sewage utilization in Maryland." *Id.* at 489, 620 A.2d 880. Indeed, it noted that "the Department of the Environment has promulgated fifty pages of regulations which thoroughly address all of these issues." *Id.* Accordingly, the Court concluded that the statutory scheme manifested a "general legislative purpose to create an all-encompassing

state scheme of sewage sludge regulation." *Id.* at 491, 620 A.2d 880.

Distinguishing *Ad + Soil, Inc.,* the Court noted that when it decided *Ad + Soil,* the State's sewage sludge laws were far less comprehensive. *Skipper,* 329 Md. at 491, 620 A.2d 880. Since then, the Legislature

> repealed the statute at issue in *Ad + Soil,* and had enacted the predecessor to the current Sewage Sludge subtitle, which this Court characterized as "a far more detailed" statute. When the present state statutory scheme is compared to the statute at issue in *Ad + Soil,* it is clear that the present state statutory scheme regulating sewage sludge addresses a multitude of additional issues, and is significantly more comprehensive and specific. The statute is "extensive and embrace[s] virtually the entire area involved." The comprehensiveness is strongly indicative of the legislative intent to preempt this entire field from local regulation.

*Id.* at 491–92, 620 A.2d 880 (citations omitted). Accordingly, the Court determined that "[t]he state public recording requirement, as part of the comprehensive state regulatory scheme, strongly suggests that there was no intent to allow local governments to enact different public recording requirements." *Id.* at 493, 620 A.2d 880.

As we see it, *Skipper* is distinguishable from the case *sub judice* in several very crucial ways. In *Skipper,* a State statutory provision expressly governed the matter of recordation, which was central to the dispute. The *Skipper* Court noted that E.A. § 9–241 specifically required the recordation of sewage sludge permits in the Office of the Department of the Environment when, at the same time, recordation was regulated by local law. Therefore, it was evident that the Legislature had spoken in regard to the matter of recordation. Yet the *Skipper* Court left room for a role by local government; it indicated that the State statute governed *unless* the Legislature specifically provided otherwise. The Court said that "where the state statute had not authorized local govern-

ment involvement, the Legislature likely contemplated that the regulation would be exclusively at the state level." *Skipper*, 329 Md. at 492, 620 A.2d 880.

In marked contrast to the situation in *Skipper*, the Legislature has not definitively or exhaustively addressed the issues within the purview of a conditional use. Indeed, State law speaks to the location of sewage sludge utilization facilities to only a limited degree. And, as we shall see in more detail, *infra*, the State statutory scheme expressly authorizes local zoning involvement. In addition, unlike in *Skipper*, the dispute here involves the kind of issue that has historically been a matter of local concern. In *Skipper*, however, the "requirement that a *state* sewage sludge utilization permit be recorded among the circuit court land records [was] not a traditional type of local government regulation. It [was] not the type of local ordinance which the General Assembly, if it intended preemption, would have been expected to have expressly disallowed." *Skipper*, 329 Md. at 493, 620 A.2d 880 (emphasis in original). Therefore, *Skipper* plainly suggests that State law is not necessarily dispositive.

Moreover, notwithstanding *Skipper*, we recently recognized the viability of *Ad + Soil* in *Holiday Point Marina Partners v. Anne Arundel County*, 107 Md.App. 160, 666 A.2d 1332 (1995), *vacated on other grounds*, 349 Md. 190, 707 A.2d 829 (1998). In that case, we declined to hold that State law impliedly preempted an Anne Arundel County ordinance that prohibited marina development within a specific distance of shellfish beds. Instead, we observed that the *Ad + Soil* Court recognized "that local zoning ordinances constitute a cornerstone of Maryland's system of land use control." *Holiday Point*, 107 Md.App. at 172, 666 A.2d 1332.

■ Several statutory provisions in the Sewage Sludge Part reveal that the Legislature contemplated local involvement in regard to traditional zoning-type matters. This indicates to us that the Legislature did not intend to preempt the authority of local jurisdictions in matters that would be of concern to them. For example, E.A. § 9–233 specifically mandates that MDE

may not issue a permit concerning a sewage sludge composting facility unless that facility is in compliance with all county zoning requirements. The provision states:

The Department may not issue a permit to install, materially alter, or materially extend a sewage sludge composting facility until:

(1) The sewage sludge compositing facility meets all zoning and land use requirements of the county where the sewage sludge composting facility is to be located; and

(2) The Department has a written statement that the board of county commissioners or the county council of the county where the sewage sludge composting facility is to be located does not oppose the issuance of the permit.

E.A. § 9–233.[3]

Moreover, E.A. § 9–234(a) obligates MDE immediately to notify any county within one mile of a proposed sewage sludge utilization site. Further, E.A. §§ 9–234(b) and (d) set forth

---

**3.** In the 1997 legislative session, House Bill 107, which was ultimately defeated, proposed amending E.A. § 9–233 to include sewage sludge storage facilities. It would have prohibited

the Department of the Environment from issuing a permit to install, materially alter, or materially extend a sewage sludge storage facility until the sewage sludge storage facility meets certain zoning and land use requirements and the Department has a written statement from a certain county government that the county government does not oppose issuance of the permit; and generally relating to the issuance of a permit to install, materially alter, or materially extend a sewage sludge utilization storage facility.

On February 7, 1997, Ira C. Cooke, the "Legislative Representative" for Wheelabrator, testified before the House Environmental Matters Committee in opposition to H.B. 107. Thereafter, by letter dated February 11, 1997, Mr. Cooke answered several questions that he had been asked by Ronald A. Guns, Chairman of the Environmental Matters Committee, during the hearing. Interestingly, in the letter, Cooke wrote:

The proposed Soaring Vista facility will store only Maryland Biosolids. MDE reviews each biosolid source prior to approval for storage and land application. Biosolids must be approved at specific land application site before MDE grants storage approval.

* * *

*All storage facilities must already comply with local laws as well as zoning and planning ordinances.*

(Emphasis added).

specific notice requirements that follow the application for a permit to utilize sewage sludge. E.A. § 9–234(f) provides that MDE "shall provide each county and municipal corporation that receives a copy of any application under this section with an opportunity to consult with the Department about the decision to issue, deny, or place restrictions on a sewage sludge utilization permit." Additionally, under E.A. § 9–235, local health officials are entitled to notification of a sewage sludge utilization permit issued in that county. E.A. § 9–243(a), which addresses inspection of sewage sludge utilization sites, provides that "to insure compliance with each sewage sludge utilization permit, a representative of the Department, the local health official, or the local health official's designee may enter and inspect, at any reasonable time, any site where sewage sludge is utilized." Further, it provides that, "[w]ith the concurrence of the Department, a local health official may: (i) Issue a stop work order to stop utilizing sewage sludge at a site; and (ii) Suspend a sewage sludge utilization permit." E.A. § 9–243(d)(1).

To be sure, there are also several State provisions that govern the location of sewage sludge utilization facilities. It is readily apparent, however, that these provisions are directed generally to health, safety, and environmental issues that would be of concern to citizens throughout the State, and not just to the people of one county or community in that county. For example, E.A. § 9–245(1) states, in part, that MDE may not issue a sewage sludge utilization permit if it determines that "[t]he applicant cannot utilize sewage sludge without: (i) Causing an undue risk to the environment or public health, safety or welfare[.]" Similarly, E.A. § 9–230(c) mandates that MDE consider, in part:

(2) The crops that are to be grown on land on which sewage sludge may be applied;

(3) The nature of any nearby surface water or groundwater;

(4) The character of any affected area;

(5) The character of nearby existing or planned land uses and transport routes;

(6) The nearness of the land on which sewage sludge may be applied to sensitive areas, including flood plains, wetlands, and areas of critical concern;

\* \* \*

(10) Reasonable buffer areas to separate any home or other property from land on which sewage sludge may be applied.

This provision, too, addresses State-wide interests, because people throughout the State might be affected by the consumption of contaminated crops. Similarly, many people care about historic areas, groundwater, and wetlands, regardless of where they personally reside.

MDE has also adopted regulations that address more universal health, environmental, and safety concerns. For example, Code of Maryland Regulations ("COMAR") 26.04.06.09A(8) establishes buffer zone requirements pertaining to the application of sludge on agricultural land. COMAR 26.04.06.09A(8)(a) sets the mandatory distances that must separate land with applied sewage sludge from certain sites, including, *inter alia,* occupied off-site dwellings, occupied on-site dwellings, wells, public roads, and bodies of water. COMAR 26.04.06.09A(8)(b) further provides:

> (b) [MDE] may require increased buffer distances or may reduce buffer distances, and may set buffer zones between sludge boundaries and other land uses. In making this determination, [MDE] may consider adjacent land use, sludge application method, sludge application rate, sludge quality, land slopes, vegetated filter strip, the nature of any surrounding bodies of water, and any other factors considered relevant by [MDE].

Although the Sewage Sludge Part includes some requirements pertaining to location of storage facilities, it does not provide an exhaustive list of criteria to be considered when deciding where a sewage sludge storage facility should be erected. This supports our belief that the Legislature recognized that the location of a sewage sludge facility is generally a matter of keen local interest, and should be considered at

the local level. *See, e.g., Holiday Point,* 107 Md.App. at 166, 666 A.2d 1332. *See generally Mayor of Annapolis v. Annapolis Waterfront Co.,* 284 Md. 383, 399–400, 396 A.2d 1080 (1979); *Norbeck Village Joint Venture v. Montgomery County Council,* 254 Md. 59, 66, 254 A.2d 700 (1969). Indeed, the Court of Appeals recently stated in *Holiday Point Marina Partners:* "Protection of the environment and of natural resources has long been recognized as a valid purpose of local zoning and land use regulations." 349 Md. at 208, 707 A.2d at 838.

Accordingly, despite the breadth of the Sewage Sludge Part generally, and the specific provisions that address safety, environmental, and health concerns, we are persuaded that the Legislature did not intend to preempt the field in regard to traditional zoning matters, such as the *location* of sewage sludge storage facilities. Rather, we believe the Legislature intended to complement, not supplant, local zoning law. Therefore, we agree with appellants that "[t]o affirm the circuit court would be to leave various matters, including the particular location of a sludge facility, if it meets MDE's permitting criteria, unaddressed and unregulated by either state or county law."

In reaching this conclusion, we are convinced that the Legislature was mindful of the vital role of zoning in accomplishing the " 'coordinated, adjusted, and harmonious development of [a] jurisdiction . . . which will . . . promote . . . [the] general welfare.' " *Schultz v. Pritts,* 291 Md. 1, 19–20, 432 A.2d 1319 (1981) (quoting Maryland Code (1957, 1978 Repl. Vol.), Article 66B, § 3.06). In *Schultz,* the Court explained:

Zoning provides a tool by which to establish general areas or districts devoted to selected uses. Indeed, the very essence of zoning is the territorial division of land into use districts according to the character of the land and buildings, the suitability of land and buildings for particular uses, and uniformity of use.

Generally, when a use district is established, the zoning regulations prescribe that certain uses are permitted as of right (permitted use), while other uses are permitted only

under certain conditions (conditional or special exception uses). In determining which uses should be designated as permitted or conditional in a given use district, a legislative body considers the variety of possible uses available, examines the impact of the uses upon the various purposes of the zoning ordinance, determines which uses are compatible with each other and can share reciprocal benefits, and decides which uses will provide for coordinated, adjusted, and harmonious development of the district.

\* \* \*

When the legislative body determines that other uses are compatible with the permitted uses in a use district, but that the beneficial purposes such other uses serve do not outweigh their possible adverse effect, such uses are designated as conditional or special exception uses.

*Id.* at 20–21, 432 A.2d 1319 (citations omitted) (footnote omitted).

What the United States Court of Appeals for the Fourth Circuit recently said in *Bryant Woods Inn, Inc. v. Howard County,* 124 F.3d 597, 603 (4th Cir.1997), is also pertinent here:

Land use planning and the adoption of land use restrictions constitute some of the most important functions performed by local government. *See, e.g., FERC v. Mississippi,* 456 U.S. 742, 768 n. 30, 102 S.Ct. 2126, 2141 n. 30, 72 L.Ed.2d 532 (1982) ("regulation of land use is perhaps the quintessential state activity"); *Village of Belle Terre v. Boraas,* 416 U.S. 1, 13, 94 S.Ct. 1536, 1543, 39 L.Ed.2d 797 (1974) (Marshall, J., dissenting) ("[zoning] may indeed be the most essential function performed by local government"). Local land use restrictions seek to prevent the problems arising from the proverbial "pig in the parlor instead of the barnyard," *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 388, 47 S.Ct. 114, 118, 71 L.Ed. 303 (1926), and to preserve "the character of neighborhoods, securing 'zones where family values, youth values, and the blessings

of quiet seclusion and clean air make the area a sanctuary for people[.]'" *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 732–33, 115 S.Ct. 1776, 1780, 131 L.Ed.2d 801 (1995) (quoting *Village of Belle Terre*, 416 U.S. at 9, 94 S.Ct. at 1541). In *Euclid*, the Court upheld the constitutionality of local land use restrictions, observing that "apartment houses which in a different environment would be not only entirely unobjectionable but highly desirable, come very near to being nuisances" in residential neighborhoods of detached houses. *Euclid*, 272 U.S. at 395, 47 S.Ct. at 121.

In reaching our decision, we have also considered that MDE recognizes the legitimacy of local involvement with respect to zoning matters. Section (G)(3) of the draft permit provided, in part, that "[t]he issuance of this permit does not ... authorize ... any infringement of federal, state, or local laws or regulations." In addition, the January 1997 Notice Of Final Determination from A. Hussain Alhija, Acting Chief of the Design and Certification Division of MDE, clearly contemplated an important local role in the sewage sludge process. Moreover, as we observed earlier, the document styled "Findings and Recommendations," which was appended to Alhija's letter, provided: "MDE considers an application for a Sewage Sludge Utilization Permit based on environmental and public health determinations. Zoning and other local issues must be determined separately by the local authority, but the Sewage Sludge Utilization Permit does not allow the permittee to violate local laws or regulations...."

We also consider it significant that the County is a home rule county, pursuant to Maryland Code (1957, 1996 Repl. Vol.), Article 25B. In accordance with Code, Article 25B, § 13, a home rule county may exercise certain powers enumerated in Code, Article 25A, § 5. Section 13 provides, in part:

If a county adopts code home rule status under the provisions of Article XI–F of the Constitution of the State and this article, it may exercise those powers enumerated ... in § 5 of Article 25A, except for subsections (A), (P),

and (S) [4] of § 5 of Article 25A, of the Annotated Code of Maryland, 1957 Edition as amended; and no county adopting code home rule status shall be excepted.

Code, Article 25A, § 5 states, in part:

### § 5. Enumeration.

The following enumerated express powers are granted to and conferred upon any county or counties which hereafter form a charter under the provisions of Article XI–A of the Constitution, that is to say:

\* \* \*

(X) *Planning and Zoning*

\* \* \*

(2) (i) It has been and shall continue to be the policy of this State that the orderly development and use of land and structures requires comprehensive regulation through implementation of planning and zoning controls.

(ii) *It has been and shall continue to be the policy of this State that planning and zoning controls shall be implemented by local government.*

(Emphasis added).

In sum, when all of these factors are viewed together, we are convinced that the Legislature did not preempt by implication the field of sewage sludge utilization with respect to traditional zoning matters, including the location of sewage sludge storage facilities. Instead of abrogating local zoning authority, the Legislature enacted a statutory scheme designed to foster cooperation between State and local authorities.

---

4. Subsection (A), (P), and (S) of Code, Article 25A, § 5 govern local legislation, bonds or evidence of indebtedness, and amendment of county charter, respectively.

## C.

The trial court recognized that the "preemption analysis is disjunctive and that [it] need only find that one of the three preemption areas exists." Nevertheless, after deciding that State law impliedly preempted the Zoning Ordinance, the court proceeded to find that the Zoning Ordinance "conflict[ed] with valid State laws." It reasoned that the Zoning Ordinance conflicted with E.A. § 9–237(a) because it imposed restrictions on sludge storage beyond what the Legislature requires. Therefore, we next consider the court's alternative finding that the Zoning Ordinance conflicts with E.A. § 9–237(a).

It is well established that "[p]reemption by conflict exists if a local ordinance 'prohibits an activity which is intended to be permitted by state law, or permits an activity which is intended to be prohibited by state law.'" *May Dep't Stores,* 118 Md.App. at 462, 702 A.2d 988 (quoting *Perdue Farms,* 109 Md.App. at 588, 675 A.2d 577, in turn quoting *Boulden v. Mayor of Elkton,* 311 Md. 411, 415–17, 535 A.2d 477 (1988)); *see Sitnick & Firey,* 254 Md. at 313–14, 255 A.2d 376. In our view, however, the Zoning Ordinance does not conflict with E.A. § 9–237(a). It provides:

(a) *Scope of permit.*—A sewage sludge utilization permit authorizes the permit holder to utilize sewage sludge according to the terms of the permit.

Appellees' obvious concern is that even after a permit holder does all that is required by the State to obtain the permit, a local jurisdiction could thwart the use of the permit by establishing hurdles and roadblocks that were not of concern to the State when it issued the permit. Appellees thus assert that the Zoning Ordinance conflicts with State law, because "the County could ban, condition, or restrict sludge storage facilities after being permitted by MDE."

As we see it, to allow a permit holder to utilize sewage sludge only according "to the terms of the permit" would effectively allow the permit holder to circumvent non-conflicting zoning regulations that are of vital import in ensuring that

a local community's needs and interests are considered and addressed. To be sure, State law imposes many requirements for sewage sludge utilization, which a local jurisdiction may not countermand. But the acquisition of a State permit is not the end of the authorization process. Rather, an applicant must also satisfy local zoning laws, so long as those laws do not contradict the State's requirements. Clearly, both levels of control are necessary in order to protect State and local interests.

The Zoning Ordinance in issue does not prohibit sewage sludge storage facilities. To the contrary, it merely requires the party who has obtained a permit from the State also to meet the requirements for a conditional use. Because the State and local provisions are complementary, we conclude that the trial court erred in ruling that the Zoning Ordinance conflicted with State law. Consistent with the cooperative approach between State and local governments that the statute employs, we believe that the issuance of a permit by the State "must be viewed as authorization to operate a sewage sludge facility, *subject to the lawful requirements of the applicable zoning regulations.*" *Ad + Soil,* 307 Md. at 336, 513 A.2d 893 (emphasis added).

Appellants' success at this juncture does not necessarily forecast ultimate victory. We emphasize that local zoning boards may not utilize the conditional use process as a ploy to frustrate or undercut an identifiable State objective. Stated otherwise, a zoning board may not arbitrarily or unlawfully withhold approval of a conditional use application that satisfies valid criteria, in order to preclude the erection of an unwanted sewage sludge storage facility. Nevertheless, such contentions are not before us; the local zoning authorities never considered the merits of appellees' conditional use application.

## Conclusion

We hold that the trial court erred in granting summary judgment in favor of appellees, and in failing to grant summary judgment in favor of appellants on the preemption issue. In light of our holding, we need not address appellants'

additional contention that the trial court erred in holding that the Zoning Ordinance was unconstitutional.

**SUMMARY JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR QUEEN ANNE'S COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY APPELLEES.**